In the

# United States Court of Appeals
### For the Seventh Circuit

———————————

No. 25-1736

BRUCE RUSH,

*Plaintiff-Appellant,*

*v.*

GREATBANC TRUST COMPANY, *et al.*,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:19-cv-00738 — **Andrea R. Wood**, *Judge*.

———————————

ARGUED DECEMBER 12, 2025 — DECIDED JULY 17, 2026

———————————

Before EASTERBROOK, JACKSON-AKIWUMI, and LEE, *Circuit Judges*.

JACKSON-AKIWUMI, *Circuit Judge*. In 2016, the Board of Directors of the printing company Segerdahl Corporation sold the company to a private equity firm. Bruce Rush, a shareholder in the employee stock ownership plan that wholly owned the company, was not simply dissatisfied with the sale, he saw malfeasance. So Rush brought this suit under the Employee Retirement Income Security Act of 1974 (ERISA),

29 U.S.C. § 1001 *et seq.*, against Segerdahl's named ERISA trustee, GreatBanc Trust Company, and several Segerdahl Board members (collectively "Defendants"). Rush alleges Defendants violated their ERISA-imposed fiduciary obligations to Segerdahl's employee stock ownership plan by organizing and approving the sale for less than Rush thinks the company was worth. After a three-week bench trial, the district court found for Defendants on all claims. We affirm.

## I.

We recount the facts from the trial record and the parties' stipulations. We begin with the Segerdahl Corporation's history and the structure of its employee stock ownership plan. We then explain Segerdahl's search for a buyer, its negotiations with the winning bidder, and the sale's approval and closing. We end with the procedural history of this case.

### A. Segerdahl and its Employee Stock Ownership Plan

Founded in 1956 and headquartered in Wheeling, Illinois, the Segerdahl Corporation was a direct-mail printer of advertisements that higher-end retailers mailed to potential customers. In 2003, Segerdahl formed an employee stock ownership plan, or ESOP. ESOPs are retirement plans that allow employees to invest for retirement by obtaining stock in the company for which they work. The ESOP that Segerdahl formed soon bought out the company's remaining shares and became the company's sole owner. GreatBanc served as the ESOP's trustee and managed its assets.

The ESOP was the brainchild of Defendant Richard Joutras, who was Segerdahl's CEO from 2003 to 2015 and the ESOP's largest individual shareholder. With the exception of GreatBanc, all other named Defendants also invested hundreds of thousands of dollars each in the ESOP. These De-

fendants are Mary Lee Schneider, Bob Cronin, Rod Goldstein, and Peter Mason. Schneider replaced Joutras as Segerdahl's CEO in 2015. Cronin, Goldstein, and Mason (the "Outside Directors") were retained by Joutras to serve as independent directors on a new Segerdahl Board, which Joutras formed to advise on and approve a possible sale of the company. Rush, who was Segerdahl's vice president of manufacturing, was also an ESOP shareholder.

In 2014, Segerdahl adopted a new "stock appreciation rights" ("SAR") plan for distributing shares in the ESOP to senior management. Under the SAR plan, Segerdahl management would receive ESOP shares in the form of SAR units that vested over three years or upon a change of control. Upon exercising an SAR, the SAR holder received, in cash, the difference between Segerdahl's share price at vesting and a "strike price" equal to Segerdahl's share price at the time the SARs were issued. The chart below shows the SARs awarded to the relevant parties in this case and their value when exercised upon Segerdahl's sale.

| Name | Number of SAR Units Awarded | Strike Price at Issuance | Share Price at Vesting | Total Cash Received from SARs Upon Exercise |
|---|---|---|---|---|
| Joutras | 800 | $4,025.90 | $13,072 | $7,236,568 |
| Schneider | 800 | $7,792.45 | $13,072 | $4,223,328 |
| Rush | 200 | $4,025.90 | $13,072 | $1,809,142 |
| Cronin | 100 | $5,719.35 | $13,072 | $735,226 |
| Goldstein | 100 | $5,719.35 | $13,072 | $735,226 |
| Mason | 100 | $5,719.35 | $13,072 | $735,226 |

In order to facilitate ESOP share redemptions, Segerdahl retained accounting firm Stout Risius Ross to conduct valuations of Segerdahl's share price at six-month intervals (on June 30 and December 31 of each year). Stout's valuations reflect that Segerdahl's share value grew considerably throughout the ESOP's lifetime, from $366.80 in December 2003, to $12,638.00 by December 2015. Joutras attributed Segerdahl's share price growth in part to a 2014 buyback of about 8,000 ESOP shares belonging to former employees. Because the buyback reduced the number of outstanding ESOP shares, the value of the 12,000 remaining shares grew. But rather than pay back all the shares' value at once, Segerdahl opted to pay only 20% of the shares' value in cash upfront and cover the remaining 80% with promissory notes payable in equal installments over four years.

### B. Segerdahl Searches for a Buyer

By 2015, with its share price continuing to climb, Segerdahl was concerned about potential liquidity issues arising from a large number of share redemptions when Segerdahl shareholders (over half of whom were over 60) retired and cashed out their shares. Given this uncertainty, Joutras and other Segerdahl managers decided to shop for a buyer for the company.

After an initial round of talks with a private equity firm fell through, Segerdahl retained JP Morgan Chase investment banker Jeffrey Vergamini to lead a search for the right buyer. Vergamini had significant experience selling companies, but had never sold an ESOP-owned company.

Segerdahl gave Vergamini a number of guidelines for the search. The most important for our purposes is Segerdahl's direction to prioritize "financial buyers" instead of "strategic

buyers." A financial buyer—typically a private equity firm—"look[s] for [an] undervalued target[] with a potential to generate high cash flow, often after a reorganization," "treats the target as a part of its financial portfolio" after acquisition, "and sells it once exit opportunities become sufficiently appealing." Alexander S. Gorbenko & Andrey Malenko, *Strategic and Financial Bidders in Takeover Auctions*, 69 J. FIN. 2513, 2513 (2014). By contrast, strategic buyers "are usually companies in a related type of business, such as competitors, suppliers, or customers" who "tend to look for targets that offer long-term operational synergies and integrate them into their own business." *Id.*

Although the parties disagree about why Segerdahl chose not to pursue strategic buyers, they do not dispute that JP Morgan pitched Segerdahl solely to financial buyers. Four private equity firms made it to the final stage of the bidding process, during which they submitted an initial, pre-due diligence bid. The final candidates and their bids were:

| Bidder | Initial Bid | Details |
|--------|-------------|---------|
| ICV | $300 million | After diligence, revised its bid to $250 million with a $15 million earn out, which Segerdahl rejected. Deal closed at $265 million with no earn out |

| Wynnchurch | $270 to $293 million | Withdrew after beginning diligence |
| --- | --- | --- |
| Madison Dearborn | $270 to $280 million, with potential to reach $306 to $318 million contingent on certain financial arrangements | Withdrew when Segerdahl reengaged following ICV's revised bid |
| Stephens Group | $250 million to $270 million | Eliminated right away because it was the low bidder |

Segerdahl cut Stephens Group early on because it was the low bidder and too skeptical of Segerdahl's value. Wynnchurch withdrew soon after beginning the due diligence process. That left ICV and Madison Dearborn as the final candidates heading into the late summer of 2016. Diligence got underway on the buyer side. Meanwhile Great-Banc, the ESOP trustee, retained Stout to prepare a valuation of Segerdahl in anticipation of the sale and retained the law firm of Drinker, Biddle, and Reath to advise on the legal side.

### C. Negotiations with ICV

Some months into the diligence phase, ICV—which had been the high bidder in the pre-due diligence round—submitted a revised, lower offer. The offer was $250 million with an additional $15 million "earnout," which ICV would pay if Segerdahl achieved certain year-end performance goals. ICV partner Lloyd Metz testified that ICV lowered its bid because

it was concerned about Segerdahl's recent profit projections. Vergamini similarly testified that ICV lowered its bid because "the business was underperforming." For his part, Rush claims the lowered bid was the result of two missteps by Defendants. First was Vergamini's disclosure, at the Board's request, of Stout's 2015 year-end valuation of Segerdahl to ICV. The second alleged error was Joutras purportedly revealing to ICV that ICV was the sole remaining bidder.

Segerdahl's initial reaction to the lowered offer was not positive, to say the least. For instance, in one internal email, Schneider described the revised offer as "the most onerous, one-sided, insulting proposal possible." Segerdahl also told Vergamini to reengage with the other remaining bidder, Madison Dearborn, but Madison Dearborn withdrew from consideration soon after Vergamini reached out. Other than attempting to reengage with Madison Dearborn, Segerdahl did not engage in discussions with any other potential buyer after receiving ICV's revised offer.

With ICV now the only remaining bidder, Vergamini focused on getting ICV to up its bid through hardball negotiation tactics. In Vergamini's own words, he "insulted" ICV and "made them feel small" in order to "put them on their back heels, put them off balance." As another "tactic," Vergamini told Segerdahl to disable ICV's access to the shared database ICV was using for diligence. In addition to this aggressive behavior, Vergamini emphasized to ICV other sources of value in the transaction, including a potential tax election that could lower Segerdahl's pretax earnings and allow ICV to reduce income tax payments (the "338(h)(10) election") and a pending sale-leaseback of Segerdahl's manufacturing facilities that, per Vergamini, would improve Segerdahl's valuation by an estimated $10 million.

After weeks of negotiations, on October 14, 2016, ICV submitted another revised bid to buy Segerdahl for $265 million in cash with no earnout. Vergamini touted $265 million as an "absolutely terrific" price "given the fact that the business was underperforming significantly" compared to the projections that Segerdahl had shared with buyers at the initial bidding stage. ICV's internal deliberations also reflect its concerns that it was overpaying at $265 million given Segerdahl's declining financial health. According to Metz, $265 million was ICV's "absolute[]" ceiling.

### D. GreatBanc Approves the Sale

As the ESOP trustee, GreatBanc had ultimate discretion to approve or reject ICV's $265 million offer. To inform its decision, GreatBanc solicited the Outside Directors' views on the transaction's fairness. GreatBanc also tasked Stout and Drinker, the accounting and legal advisors for GreatBanc in its capacity as ESOP trustee, with evaluating the sale.

The Outside Directors recommended that GreatBanc approve the sale to ICV at $265 million. In deciding whether to recommend approving the sale, the Outside Directors considered Segerdahl's poor financial performance against its projections in the second half of 2016; the ESOP's prior valuations and projected future valuation; the fact that ICV was paying a higher EBITDA[1] multiple than comparable transactions;

---

[1] EBITDA means Earnings Before Interest, Taxes, Depreciation, and Amortization. *Kuebler v. Vectren Corp.*, 13 F.4th 631, 640 n.3 (7th Cir. 2021). "This metric is often used to evaluate a company's operating performance independent of potentially 'noisy' factors that can vary from company to company based on existing capital structure, tax issues, and the like." *Id.* Financial analysts often value private companies by multiplying their EBITDA by a factor called an "EBITDA multiple," which is "determined by a combination of precedent transaction analysis, examining current

and Segerdahl's uncertain future if it decided not to consummate the transaction. The Outside Directors also weighed whether to seek out competing bids from two strategic buyers, RR Donnelley and Quad/Graphics, but decided that doing so was not in the ESOP's best interest.

Stout conducted a "fairness analysis" that valued Segerdahl at $249 to $293 million. The fairness analysis did not expressly reference the 338(h)(10) election, the sale-leaseback, or the expected value of a settlement Segerdahl expected to receive in litigation over fraud by a temporary staffing agency at one of Segerdahl's facilities (which the parties refer to as the "Wolf Road fraud"). Stout nevertheless concluded the $265 million proposed sale price was adequate consideration for the ESOP because it represented "not less than Fair Market Value" for the ESOP's shares.

The Drinker due diligence report considered the myriad legal issues relevant to the proposed sale. These included executive employment and transaction bonus agreements, change of control payments, and potential claims such as for the Wolf Road fraud. The Drinker attorney who prepared the diligence report, David Rubenstein, testified that Drinker considered the 338(h)(10) election but did not view it as "material" because Drinker doubted whether a buyer would pay more for the opportunity to exercise the tax election post-sale. Drinker also considered the potential impact of a settlement of litigation over the Wolf Road fraud, and similarly con-

---

market trends and other valuation methodologies." Jack Chang, *A Guide to EBITDA Multiples and Their Impact on Private Company Valuations*, FORBES (June 16, 2022, 8:15AM), https://www.forbes.com/councils/forbesbusinesscouncil/2022/06/16/a-guide-to-ebitda-multiples-and-their-impact-on-private-company-valuations/.

cluded it was not material because the litigation was not near an end and any potential return was "speculative" and not significant enough to affect the deal.

Along with the opinions from Stout and Drinker, Great-Banc conducted its own investigation of the ICV transaction during the summer and fall of 2016. GreatBanc's CEO Jim Staruck, who oversaw the trusteeship of Segerdahl, attended at least two meetings with management and Vergamini, during which the group discussed the value of the 338(h)(10) election, the sale-leaseback, and the potential Wolf Road fraud settlement.

The GreatBanc Fiduciary Committee (which signed off on all GreatBanc trustee decisions) approved the transaction during a meeting on November 29, 2016. Staruck's notes from the meeting explained that ICV's revised bid of $265 million was reasonable in light of negative financial projections Segerdahl had released over the prior months. Staruck's notes also reflected that Stout had not included either the sale-leaseback or the 338(h)(10) election in the valuation because there were too many outstanding variables for either to be a net value add.

The November 29 meeting minutes reflect that Staruck was concerned about the opportunity cost of not accepting ICV's offer—namely, the prospect of liquidity issues arising from stock repurchases and how that might hamper Segerdahl's growth strategy. The Committee also discussed the post-sale compensation structure for management, including Schneider, and Stout's representative Andrew Ward opined that the post-sale compensation arrangements were "relatively standard in a private equity purchase deal."

GreatBanc memorialized its approval of the transaction in a Fiduciary Process Compliance Report ("GreatBanc Report"), which Staruck prepared. The report explained that the transaction was prudent because Segerdahl's forecasts were on a downturn and Segerdahl faced considerable repurchase liability in the coming years. It also emphasized that the thorough sales process reflected Segerdahl's market value.

The deal closed on December 7, 2016. Shortly before the closing, Vergamini and Segerdahl's management—including Rush—met to discuss the pending sale. Rush testified that during the meeting, Vergamini told attendees that, because he knew the CEO of a strategic buyer, Quad/Graphics, he "could have sold [Segerdahl] to [Quad/Graphics] for $320 million," and wrote "320 M" on a whiteboard. Every other witness who was at the meeting denied Vergamini said this, including Vergamini himself.

Upon closing, Segerdahl management received the cash value of their SARs, which was equivalent to the $13,072 share price at which ICV bought Segerdahl minus the strike price at which the shares were issued. Joutras received $7,236,568; Schneider received $4,223,328; Rush received $1,809,142; and the Outside Directors each received $735,226. Schneider rolled over approximately $1.2 million of the proceeds from her SARs into shares in the post-sale company and received other "incentive" shares that were worth approximately $573,000 when she left the company in 2018.

### E. Procedural History

Dissatisfied with the sale price, Rush sued GreatBanc, Joutras, Schneider, and the Outside Directors for approving the sale in violation of their fiduciary duties to the ESOP. The district court certified a class comprising between 400 and 500

ESOP shareholders, 2021 WL 2453070 (N.D. Ill. June 16, 2021), and denied in large part Defendants' summary judgment motions, 2022 WL 17740418 (N.D. Ill. Dec. 16, 2022). The case culminated in a three-week bench trial that featured testimony from thirteen fact witnesses and four experts. The court also received approximately 500 pages of post-trial submissions.

Following trial, the district court issued a comprehensive written opinion awarding judgment to Defendants on all counts. Put simply, the district court found the facts did not support Rush's theory that Defendants purposefully depressed the sale price to benefit themselves at the expense of the class and in violation of their ERISA-imposed fiduciary duties. To the contrary, the district court found that Segerdahl and JP Morgan obtained the best price they could for Segerdahl given its declining performance, and GreatBanc fulfilled its fiduciary obligations in approving the sale. The district court also concluded that Rush had not proven that any Defendant's conflict of interest tainted the transaction in violation of ERISA's prohibited-transaction rules. Rush challenges these findings on appeal.

## II.

On appeal of a bench trial ruling, we review a district court's legal conclusions de novo, and its factual findings for clear error. *PNC Bank, Nat'l Ass'n v. Boytor*, 109 F.4th 495, 503 (7th Cir. 2024). We defer to the district court's factual findings unless they are "illogical or implausible" or "lack support in inferences that may be drawn from the facts in the record." *Estrada-Martinez v. Lynch*, 809 F.3d 886, 895 (7th Cir. 2015) (citation modified) (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 577 (1985)). Put differently, "our task on appeal is not to see whether there is any evidence that might undercut the dis-

trict court's finding; it is to see whether there is any evidence in the record to support the finding." *Baz v. Patterson*, 100 F.4th 854, 870 n.5 (7th Cir. 2024) (citation modified).

### III.

Rush's challenges to the district court's bench trial ruling fall into four categories: (1) a challenge to the district court's determination that the individual Defendants (Joutras, Schneider, and the Outside Directors) were not fiduciaries of the ESOP and so could not be liable for breaching any fiduciary duties; (2) challenges to the district court's findings that Defendants did not breach any fiduciary duties they may have owed to the ESOP; (3) challenges to the district court's rulings that no Defendant possessed a conflict of interest that would render the sale a "prohibited transaction" under ERISA, *see* 29 U.S.C. § 1106; and (4) challenges to the district court's ruling that Rush failed to prove damages.

We need not address Rush's first argument challenging the district court's ruling that the individual Defendants were not fiduciaries of the ESOP. Even assuming that *all* Defendants were fiduciaries, we see no clear error in the district court's determination that Rush failed to prove that any Defendant breached their fiduciary duty to the ESOP. We also see no clear error in the district court's finding that no Defendant violated ERISA's prohibited-transaction rules. Finally, we see no clear error in the district court's conclusion that Rush failed to prove damages.

### A. Breach of Fiduciary Duties

ERISA imposes two relevant types of fiduciary duties on trustees and managers of ESOP assets: the duty of prudence and the duty of loyalty. *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth*, 99 F.4th 928, 943 (7th

Cir. 2024). The duty of prudence requires a fiduciary to manage plan assets "with the care, skill, prudence, and diligence under the circumstances … that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). The duty of loyalty requires plan fiduciaries to discharge their duties "solely in the interest of the plan's participants and beneficiaries" and to "deal fairly and honestly with beneficiaries … so as to ensure that a plan receives all funds to which it is entitled." *Cunningham v. Cornell Univ.*, 604 U.S. 693, 696 (2025) (citation modified); *see also* 29 U.S.C. § 1104(a)(1)(A).

Rush contends the district court legally and factually erred in holding that none of the Defendants violated their fiduciary duties. He argues the district court committed legal error by applying an overly deferential standard of review to Defendants' decisions. And Rush claims that the district court factually erred in finding none of the Defendants' conduct amounted to breach. We take these arguments in turn.

### 1. The District Court's Standard of Review

Rush asserts the district court erroneously applied an abuse-of-discretion standard of review to Defendants' decisions regarding the sale. In Rush's view, the district court read too much into our decision in *Armstrong v. LaSalle Bank National Ass'n*, where we stated that "[i]n general, judicial review of the decisions of an ERISA trustee as of other trustees is deferential unless there is a conflict of interest" and adopted an abuse-of-discretion standard for such review. 446 F.3d 728, 732–33 (7th Cir. 2006). Rush maintains the abuse-of-discretion standard adopted in *Armstrong* is limited to review of a fiduciary's decisions that involve balancing the interests of different groups of plan participants against each other. Rush ob-

serves that every ESOP shareholder had the same interest in obtaining the highest possible sale price for the company. So, Rush reasons, *Armstrong*'s deferential standard does not apply to this case, and we should conduct a searching, "plenary" review of Defendants' conduct.

We disagree. *Armstrong* means what it says: an ERISA fiduciary's decisions should receive judicial deference where there is no conflict of interest. The Supreme Court has observed that "principles of trust law" inform the standard of review for ERISA fiduciaries' decisions. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989) (citing *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1985)). Well-settled trust law principles instruct that a trustee's discretionary decisions involving the administration and management of plan assets receive deferential review. *See Restatement (Third) of Trusts* § 87 cmt. b (A.L.I. 2007); *Bruch*, 489 U.S. at 111 ("Trust principles make a deferential standard of review appropriate when a trustee exercises discretionary powers."); *Morton v. Smith*, 91 F.3d 867, 870 (7th Cir. 1996) (explaining that a trustee's discretionary decisions are reviewed for abuse of discretion). And the ESOP plan document itself states that the ESOP administrator has "sole and absolute discretion" in discharging its duties under the plan. *See Johnson v. Allsteel, Inc.*, 259 F.3d 885, 890 (7th Cir. 2001) (judicial review of fiduciary's decisions is deferential where plan itself vests fiduciaries with discretion). Accordingly, the district court applied the correct standard of review to Defendants' fiduciary decision making.

## 2. Alleged Fiduciary Breaches

We turn to the district court's conclusion that no Defendant breached their fiduciary duties to the ESOP. We find no error, much less clear error.

We emphasize again that our task is not to reweigh the evidence or find the facts anew. On clear error review, we only assess whether the district court's findings have any support in the record. If so, we must affirm even if we might have come to a different conclusion were we sitting as the trier of fact. *See Anderson*, 470 U.S. at 573–74. "A finding that is plausible in light of the full record—even if another is equally or more so—must govern." *Cooper v. Harris*, 581 U.S. 285, 293 (2017) (citation modified).

Rush does not clear this high hurdle with respect to any of his fiduciary breach claims. Rush argues that Defendants breached their fiduciary duties to the ESOP in five ways: (1) by marketing Segerdahl to financial buyers to the exclusion of strategic buyers; (2) by resuming negotiations with ICV after ICV lowered its offer; (3) by allegedly disclosing the 2015 valuation of Segerdahl to ICV during the diligence process; (4) by allegedly disclosing to ICV that it was the only bidder; and (5) as to GreatBanc, by failing to fulfill its fiduciary obligations to supervise the negotiations and adequately scrutinize the deal's fairness.[2] With each argument, Rush disagrees with the

---

[2] Rush has waived all other bases for his fiduciary breach claims. *See R.R. Maint. & Indus. Health & Welfare Fund v. Mahoney,* 144 F.4th 957, 964 (7th Cir. 2025) ("Perfunctory and undeveloped arguments are waived …." (citation modified)).

way the district court interpreted the evidence, but he does not point to any clear error in the district court's findings.

### a. Excluding strategic buyers

The parties agree that the Board told JP Morgan to prioritize financial buyers over strategic buyers in the initial search. The parties disagree about why. As Defendants tell it, only two competitors in the direct mail printing industry, Quad/Graphics and RR Donnelley, were plausible candidates, and Segerdahl believed neither company was in a position to consummate such a large transaction. RR Donnelley was in the process of splitting into three new public companies and had recently purchased another direct-mail company. And Segerdahl believed Quad/Graphics was struggling financially and would not be in financial shape to make a large acquisition. Finally, Segerdahl noted that the transaction might not be enticing to Quad/Graphics or RR Donnelley because those companies were operating at EBITDA multiples lower than Segerdahl's. As Vergamini testified, publicly traded companies typically do not buy assets with EBITDA multiples higher than their own because the market typically values the earnings of the acquired asset at the acquirer's lower multiple, which diminishes the value of paying a higher price for a better-performing asset.

Defendants also testified to more generalized concerns that marketing the company to strategic buyers might allow Segerdahl's competitors to use the due diligence process to get a competitive advantage over Segerdahl. Of course, if the sale closed, that wouldn't matter. But if talks fell through, the sensitive information the would-be acquirer learned about Segerdahl during the due diligence process could give that competitor a leg up in the intensely competitive direct-mail

printing industry. Segerdahl additionally feared the diligence process could cause salespeople Segerdahl had recently poached from Quad/Graphics and RR Donnelley to return to their old employers or move to another company.

As Rush tells it, Defendants' rationales for pursuing financial buyers are neatly arranged stories concocted after the fact to cover up the real reasons Defendants did not want to shop Segerdahl to competitors. First, Rush claims the Board wanted to depress the sale price to ensure Schneider would more easily be able to obtain equity in the post-sale company—a lower sale price meant post-sale shares would be cheaper. To achieve this aim, Rush argues Defendants intentionally steered JP Morgan towards financial buyers because they knew financial buyers would on balance pay less for Segerdahl than strategic buyers. Second, Rush contends that senior management, including Joutras and Schneider, thought a financial buyer would be more likely to retain the current management after the sale. Rush argues that Defendants intentionally pursued both these ulterior objectives at the expense of maximizing the ESOP's sale price.

We see no clear error in the district court's rejection of Rush's theories. True, Rush points to evidence that Schneider and Joutras were concerned that a sale to a strategic buyer would lead to mass layoffs, including of senior personnel. For example, Rush highlights an email in which Schneider observes "[a] strategic buyer would likely pay more—and we could have pursued that. In that scenario, the vast majority of the workforce would be out of jobs day 1."

This statement certainly *could* support the conclusion that Schneider excluded strategic buyers to save jobs and at the expense of shareholder value. But the district court instead

chose to credit Schneider and Joutras's testimony that the decision to exclude strategic buyers was motivated by the risk of allowing competitors to access competitively sensitive information as part of the diligence process. The district court further accepted Defendants' explanations that RR Donnelley and Quad/Graphics were in poor positions to acquire Segerdahl in any event. And the district court believed Schneider's explanation that her email was describing a hypothetical world in which a strategic buyer had the balance sheet necessary to complete a transaction. Because each of these findings has some support in the record, the district court did not clearly err in concluding that Defendants' explanations for not shopping Segerdahl to RR Donnelley or Quad/Graphics were more credible than Rush's own hypotheses. *See Cooper*, 581 U.S. at 309 (courts of appeals owe "singular deference to a trial court's judgments about the credibility of witnesses").

The district court also reasonably concluded that Schneider, Joutras, and the Outside Directors would not have intentionally searched for a buyer who would pay *less* for Segerdahl given that the value of their SARs was directly tied to Segerdahl's sale price. Rush does not and cannot dispute that the individual Defendants' pecuniary interests were aligned with the ESOP's own interests in obtaining a higher sale price. In sum, the district court did not clearly err in finding that excluding strategic buyers was not a breach of fiduciary duty.

### b. Resuming negotiations with ICV following revised offer

Rush next argues that Defendants' decision to reengage with ICV after it dropped its offer from $300 million to $250 million shows that Defendants were not acting in the ESOP's best interests. Rush reasons that prudent fiduciaries would

have gone to Quad/Graphics or RR Donnelley for a competing bid rather than come back to the table with ICV right away. Instead of getting another bid, Rush claims Joutras and Schneider returned to ICV out of personal motivations to close the sale before year's end. Specifically, Rush notes that, around the same time the Board decided to reengage with ICV, Segerdahl's tax lawyers told it that IRS guidance prohibited Segerdahl from using its own stock to secure the promissory notes issued in connection with the 2014 share buyback. Rush reasons that because Joutras and Schneider faced impending "personal liability" for the securitization issue, they wanted to get the deal done (and get out) quickly, rather than shop the company further and get a better price.

The district court soundly rejected that theory. It noted that the risk of IRS action was "speculative" and "hypothetical" because the securitization guidance was just that—guidance. Nothing in the guidance compelled the IRS to investigate Segerdahl, and the IRS had not yet done so. Thus, even if Segerdahl's conduct actually violated IRS rules (as Rush's expert testified), the district court reasonably concluded the risk of personal liability was remote and did not justify a finding that Joutras or Schneider breached their fiduciary duties.

Rush's theory has other defects. If Joutras and Schneider were chiefly motivated to close the deal as quickly as possible rather than to get the best price for the sale, one would have expected them to accept the initial $250 million offer outright. They instead aggressively pushed ICV—through Vergamini—to bump up the sale price over more than a month of additional negotiations. This conduct is wholly inconsistent with Rush's need-for-speed assertion. Moreover, the record shows Segerdahl did not engage with RR Donnelley and Quad/Graphics following ICV's lowered offer for the same

reasons they did not include strategic buyers in the initial candidate pool: they were concerned about disclosing sensitive information to competitors and did not think either company was financially able to support a transaction.

### c. Disclosing 2015 valuation to ICV

Rush next attacks the Board's decision to disclose Stout's 2015 year-end valuation of Segerdahl to ICV during the diligence process. He claims no reasonable fiduciary would have disclosed Segerdahl's valuation in the midst of diligence, especially because the valuation had a confidentiality provision requiring GreatBanc's consent before disclosure (which Segerdahl did not obtain). In support, Rush cites testimony from Staruck and GreatBanc's legal counsel, both of whom stated that it typically is not in a seller's interest to divulge such information.

The district court instead found persuasive Vergamini's explanation that he shared the valuation because "it told a good story of why this business should be valued highly because it's growing and it's got high EBITDA and the margin profile is strong." Schneider, too, stated she told Vergamini to share the valuation because she wanted to "provide some understanding of what [the] share price was so they understood what the minimum floor was, and they could build from there."

The district court did not clearly err in believing Vergamini and Schneider's stated reasons for disclosing the valuation. *See Cooper*, 581 U.S. at 309. While Rush argues in hindsight that the valuation led to ICV lowering its offer, the district court observed that Segerdahl's poor performance in the first half of 2016 is a more likely explanation for ICV's decision. Nothing in the record contradicts that finding, so we

may not disturb it. *See Anderson*, 470 U.S. at 574 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

### d. Leaking to ICV that it was the only bidder

Rush contends Joutras violated his fiduciary duties by disclosing to ICV's Frank Clark that ICV was the only active bidder, which Rush claims led ICV to lower its bid. In support, Rush cites an email exchange between a Segerdahl executive and Vergamini in which the two speculate about whether Joutras "leaked [this fact] to Frank Clark" because "[h]e has a hard time keeping things to himself."

The district court found that there was no leak and that ICV independently discerned it was the only bidder. The trial evidence supports that conclusion. Metz denied that ICV received a leak from Joutras that it was the only buyer. Instead, Metz testified that ICV's own diligence provided it with insight into its position in the bidding process. Metz also explained that ICV inferred it was the sole bidder from Vergamini's "begging and pleading" for ICV to raise its revised offer. It was not clear error for the district court to believe ICV's explanation over Rush's speculative contentions. *See Estrada-Martinez*, 809 F.3d at 895 ("When a fact-finder bases her finding on a decision to credit a witness's testimony, that finding 'can virtually never be clear error' as long as the testimony is 'coherent and facially plausible,' 'not internally inconsistent,' and 'not contradicted by extrinsic evidence.'" (quoting *Anderson*, 470 U.S. at 575)).

### e. Failing to perform trustee obligations

Finally, Rush contends GreatBanc failed to fulfill its fiduciary duties because it did not independently negotiate the sale price and instead simply rubber-stamped the deal Ver-

gamini and the Board struck with ICV. The district court disagreed, finding that GreatBanc discharged its fiduciary obligations by relying on a litany of independent advisors: JP Morgan, Stout, and Drinker.

Rush protests that such independent advice cannot "whitewash" a trustee's failure to perform its fiduciary obligations. *See Donovan v. Bierwirth*, 680 F.2d 263, 272 (2d Cir. 1982) (observing that obtaining independent counsel does not "operate as a complete whitewash which, without more, satisfies ERISA's prudence requirement"). GreatBanc did not merely defer to its independent advisors though. It conducted its own investigation, which included attending at least two meetings with Vergamini and the Board; holding a half-day Fiduciary Committee meeting to approve the transaction, at which Staruck and GreatBanc's advisors questioned the sale's fairness at length; and preparing a written report memorializing its reasoning for approving the transaction. GreatBanc's "careful and impartial investigation" of the soundness of its advisors' recommendation satisfied its fiduciary obligations in this case. *Donovan*, 680 F.2d at 271; *see also Keach v. U.S. Tr. Co.*, 419 F.3d 626, 637 (7th Cir. 2005) (stating that a trustee discharges its fiduciary duties if it obtains independent advice from an expert, "'investigate[s] the expert's qualifications,' 'provide[s] the expert with complete and accurate information' and 'make[s] certain that reliance on the expert's advice is reasonably justified under the circumstances.'" (quoting *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996))); *Adams v. Thiokol Corp.*, 231 F.3d 837, 845 (11th Cir. 2000) (holding that "input from two independent firms" supported proper exercise of fiduciary duties).

We conclude Rush has not shown the district court clearly erred in rejecting all of Rush's fiduciary breach claims.

## B. Prohibited Transaction

We now turn to Rush's claims that the Segerdahl sale was a prohibited transaction under 29 U.S.C. § 1106. As relevant here, § 1106(a)(1) bars a plan fiduciary from causing the plan "to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect … [transaction] between the plan and a party in interest." Section 1106(b) prohibits a plan fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account," "act[ing] in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan" or "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." § 1106(b)(1)–(3).

Rush contends the district court improperly overlooked his evidence that the Defendants—specifically Schneider and GreatBanc—were conflicted. Affording the district court's decision its due deference, we again find no clear error.

### 1. § 1106(b) Claims against Schneider

Before the district court, Rush asserted § 1106(b) claims against Schneider, Joutras, and the Outside Directors based on their alleged conflicts of interest in shepherding the sale to ICV. On appeal, however, Rush expressly abandons his § 1106(b) claims against Joutras and focuses his arguments on Schneider's alleged self-dealing. We limit our discussion accordingly.[3]

---

[3] Rush did not similarly state that he is abandoning his prohibited-transaction argument as to the Outside Directors. Yet his argument regarding the Outside Directors is limited to a few paragraphs at the end of

Rush argues that Schneider was conflicted in violation of § 1106(b) because she had two personal objectives in direct conflict with maximizing the ESOP's value: (1) keeping her job as CEO of the post-sale company, and (2) growing her equity stake in the company, which she accomplished to the tune of nearly $1.75 million upon the sale's closing.

The district court reasonably credited testimony that it was ICV, not Schneider, who pushed Schneider to stay on as CEO and roll over her equity stake to invest in the new company's stock. As Schneider testified, "I don't know of any private equity firm that takes over a company and doesn't have an expectation of management rolling money back into the company to keep their jobs. That's how it works." Staruck similarly testified that, in his experience as trustee for dozens of ESOP transactions, the majority involve executives staying on and rolling over their equity into shares in the post-sale company. Moreover, ICV's internal discussions reflect its desire to keep Schneider on board. In one diligence document, ICV named the "[o]pportunity to back a strong CEO" as a reason why it was looking to buy Segerdahl. And Rush once again fails to marshal evidence that Schneider—who received $4.2 million from her SARs upon the deal's closing—acted against her own pecuniary interests by intentionally depressing the sale price. We find no clear error in the district court's determination that Schneider did not violate § 1106(b).

---

his reply brief. That constitutes waiver under our caselaw. *See Bradley v. Vill. of Univ. Park*, 59 F.4th 887, 897 (7th Cir. 2023) (explaining that appellants waive arguments they fail to raise in the opening brief on appeal).

### 2. § 1106(a)(1) Claims against GreatBanc

Rush also claims GreatBanc "cause[d] the plan to engage in" the sale to ICV in violation of § 1106(a) because it approved the transaction despite knowing Schneider would be purchasing stock in the post-sale company. Applying our decision in *Leigh v. Engle*, 727 F.2d 113, 126 (7th Cir. 1984), the district court rejected that argument on grounds that Rush did not show that Schneider possessed any intent to injure the ESOP to benefit her post-sale investment.

Rush argues the district court's intent requirement misreads *Leigh*. We agree with the district court's interpretation. It is true that *Leigh* urges a broad reading of ERISA's prohibited transaction rules. *See id.* at 126 ("We do not believe that Congress intended the language 'use by or for the benefit of, a party in interest,' … to be interpreted narrowly." (citation omitted)). But we have rejected a wooden, literal reading of § 1106(a) that would turn commonplace plan activities into ERISA violations. In *Albert v. Oshkosh Corp.*, the plaintiff, like Rush, argued that a plaintiff can make out a § 1106(a) claim "merely by identifying a 'party in interest' … and alleging that the party in interest engaged in one of the transactions listed in § 1106(a)(1)." 47 F.4th 570, 585 (7th Cir. 2022) (citing 29 U.S.C. §§ 1002(14), 1106). We disagreed because that reading "would prohibit fiduciaries from paying third parties to perform essential services in support of a plan"—an "absurd result[] … inconsistent with ERISA's statutory purpose." *Id.* at 584–85.

The same logic applies here. The bright-line rule Rush advocates would mean that a fiduciary violates ERISA's prohibited transaction rules whenever it approves a transaction knowing that an officer of the ESOP intends to invest in the

post-sale entity. Under such a rule, ESOP officers would no longer be able to maintain equity in their companies after a transaction. But, as the evidence presented at trial established, buyers prefer—and even expect—ESOP officers to have a stake in the post-sale company, especially when they are staying on in an executive capacity. Preventing post-sale investment by ESOP officers would, on balance, decrease the sale price and thereby injure ESOP shareholders. As such, Rush's proposed rule would contravene the very purposes of ERISA.

Moreover, even assuming Schneider's post-sale investment qualifies the sale as a prohibited transaction, Rush's § 1106(a) claim fails for another reason. The district court did not clearly err in finding Defendants had proved their "adequate consideration" affirmative defense. This defense immunizes a defendant from liability under the prohibited transaction rules if the defendant proves that the "acquisition, sale, or lease" at issue "is for adequate consideration." 29 U.S.C. § 1108(e)(1); *Cunningham*, 694 U.S. at 702. In the context of an ESOP sale, adequate consideration comprises two requirements: "a substantive requirement that the value assigned reflect the fair market value of the asset, and a procedural requirement that the fiduciary actually determine the value assigned in good faith." *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 680 (7th Cir. 2014).

As to the procedural requirement, as we explained earlier, the district court did not err in finding GreatBanc fulfilled its fiduciary obligations in approving the sale. For those same reasons, we see no clear error in the district court's determination that GreatBanc estimated Segerdahl's value in good faith.

The substantive inquiry—whether the district court permissibly found that Defendants sold the ESOP for fair market value—dovetails with Rush's damages arguments, so we turn to them now. As we discuss below, we find no clear error in the district court's determination that Defendants sold the ESOP for its fair market value, so Defendants would prevail on their adequate consideration defense even if Schneider's post-sale investments fell within the prohibited transaction rules. *Id*.

## C. Damages

Damages in ERISA breach-of-fiduciary-duty cases are measured by the difference between the value of the plan assets when the plaintiff cashed them out and what the assets would have been worth absent the breach—i.e., their fair market value. *Harzewski v. Guidant Corp.*, 489 F.3d 799, 807 (7th Cir. 2007); *Brundle ex rel. Constellis Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*, 919 F.3d 763, 781 (4th Cir. 2019), *as amended* (Mar. 22, 2019). Rush's damages argument relies on an estimate prepared by his expert, Daniel Van Vleet. Van Vleet opined that the sale to ICV damaged the ESOP by $19 million or $44 million (depending on the method of valuation). The district court disagreed with Van Vleet's analysis on grounds that Van Vleet "presumes a hypothetical buyer and assigns damages regardless of whether there was a market for Segerdahl at the calculated fair market value." Because Rush had not shown there was an actual buyer willing to pay the higher price Van Vleet suggests Segerdahl was worth, the district court did not credit Van Vleet's estimate as evidence of damages.

We review the district court's fair-market-value determination for clear error. *Eyler v. Comm'r*, 88 F.3d 445, 451 (7th

Cir. 1996). We see none here. The district court reasonably concluded that the price ICV paid after conducting diligence and arms-length negotiations with Segerdahl and JP Morgan was a better approximation of fair market value than Van Vleet's "hypothetical buyer" analysis. As Vergamini testified, fair market value in the mergers and acquisitions context is "[u]ltimately … what the market dictates it is." *Cf. Balcor Real Est. Holdings, Inc. v. Walentas-Phoenix Corp.*, 73 F.3d 150, 153 (7th Cir. 1996) ("[T]he best evidence of the market value … is what people pay for it.").

As other evidence of damages, Rush points to his own testimony that Vergamini boasted to a room full of Segerdahl executives that they "could have sold [Segerdahl] to [Quad/Graphics] for $320 million." But the district court did not clearly err in not crediting this uncorroborated hearsay. *Cf. PNC Bank*, 109 F.4th at 505–06 (no clear error in refusing to credit plaintiff's testimony where there were sound justifications for doubting his version of events).

Finally, Rush insists the final sale price did not reflect three other sources of value: the pending sale-leaseback of some of Segerdahl's Chicagoland facilities; the 338(h)(10) tax election; and the settlement value of the "Wolf Road fraud" case. Rush claims Defendants failed to market these points to ICV and that this failure depressed ICV's offer below Segerdahl's fair market value.

The record shows otherwise. As the district court found, Defendants did pitch each of these sources of value to ICV. ICV simply did not agree that they were worth as much as Rush believes. For example, Vergamini marketed the sale-leaseback to buyers as a way to move debt off Segerdahl's balance sheet. Despite Vergamini's "pounding the table" on the

sale-leaseback's benefits, ICV did not see any value in it after conducting its own diligence. Similarly, Ward and Metz each testified that the Wolf Road litigation came up in Stout's and ICV's respective diligence, and Drinker's diligence memo references the litigation as well. Ward and Staruck testified that the value of the Wolf Road settlement was ultimately uncertain and depended on contingencies like whether the defendant was solvent and the progress of the litigation.

As for the 338(h)(10) tax election, the record shows—contrary to Rush's assertions—that ICV did incorporate the tax election into its $265 million revised offer. Rush's assertions that the sale price failed to reflect the tax election's value seem simply to reflect his view that the election should have been valued more highly.

In sum, the district court did not clearly err in rejecting Rush's damages arguments.

## IV.

The district court issued a thorough decision following a three-week-long bench trial during which Rush had ample opportunity to present his case. Rush has a different view of the facts. But our role on appeal is not to retry issues the district court permissibly resolved against him after applying the correct legal standard to the disputed facts.

AFFIRMED.